Receipt 0671261

ORIGINAL

FILED
OCT 2 2 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., an Oregon corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through the Department of Transportation, Federal Highway Administration, Western Federal Lands Division,<br><br>*Defendant.* | No. 07-738 C<br><br>**COMPLAINT**<br>Federal Highway Administration<br>Contract No. DTFH70-98-C-00027<br><br>(Contract Disputes Act) |

**PARTIES**

1. White Buffalo Construction, Inc. ("WBC") is an Oregon corporation in good standing and duly licensed as a contractor.

2. The defendant is the United States of America, acting by and though the Department of Transportation, Federal Highway Administration, Western Federal Lands Highway Division ("FHA").

**JURISDICTION**

3. This Court has jurisdiction of the claims presented here under the Contract Disputes Act of 1978 (the "CDA"), 41 U.S.C. § 609(a)(1), and 28 U.S.C. § 1491(a)(2).

**STATEMENT OF FACTS**

4. On August 20, 1998, the United States awarded to WBC FHA Contract No. DTFH70-98-C-00027 (the "Contract") on the Siskiyou National Forest ("SNF").

5. At all material times herein, WBC performed all obligations on its part to be performed or was otherwise excused from performance as herein alleged. WBC was ready, willing and able to perform all remaining obligations.

6. FHA failed to cooperate with WBC by not allowing WBC to commence work until September 15, 1998 and by not providing the required additional contract time due to WBC because of the late Notice to Proceed ("NTP"). FHA erred in its belief that WBC could not commence work on September 1, 1998 due to environmental restrictions.

7. The contract contains environmental restrictions that prohibit commencement of work until September 15, 1998 for four of the ten sites on FDR 33 because clearing and grubbing was required at these sites. However, work could have started September 1, 1998 on six of the sites on FDR 33, but FHA did not allow this. The contract allowed work to be performed without any restriction at Mile Post ("MP") 46.2.

8. Due to the failure of FHA to issue the NTP on September 1, 1998, WBC lost 25 percent of its work window for "wetted perimeter" work at MP 46.2.

9. FHA concealed from WBC the fact that it had discovered "excess" material that it had directed WBC to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by WBC.

10. FHA concealed from WBC that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter." FHA misled WBC by informing it that the permitting agencies had refused to grant any extension. When WBC directly approached the permitting agencies and obtained permission from them to continue work, FHA refused to allow WBC to continue any installation and, instead, directed WBC to perform only winterization work and stopped all work at the culvert at MP 46.2

11. FHA unnecessarily restricted WBC's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area that it arbitrarily determined could be reached by high water. FHA used the unusual term "wetted perimeter of

any stream" to indicate areas that would be subject to the restrictions of the permit even though the permit and the permitting agencies use the term "in-water work."

12. FHA restricted WBC's operations in any area that it arbitrarily determined could be reached by high water. In the case of the critical repair at MP 46.2, WBC was prohibited after November 1, 1998 from working on installations in areas that were clearly well out of the stream, including working on the fill at the top of the culvert.

13. FHA later changed the term "in-water work" in 1999 for the completion contract.

14. FHA refused to address the changed condition at FDR 33 MP 46.7. This failure to act resulted in WBC's incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot, when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

15. On or about November 3, 1998, WBC met with Contracting Officer William Parsons ("CO Parsons") and other FHA officials in Vancouver at the request of WBC to discuss concerns that WBC had about lack of progress and its belief that it was being hindered from completing the project.

16. On or about November 13, 1998, Contracting Officer Carol H. Jacoby ("CO Jacoby") issued a cure notice.

17. On or about December 1, 1998, CO Parsons issued a final decision notifying WBC that it was terminated, effective upon WBC's receipt of the notice (December 3, 1998), alleging that WBC was in default.

18. On or about December 3, 1998, FHA required WBC, through its surety, Insurance Company of the West ("ICW"), to retain another contractor to perform what was characterized as emergency work. WBC and ICW retained Kerr Contractors ("Kerr") to perform this work.

19. As soon as WBC was terminated, FHA had Kerr start removal of the slide. Within a week, U.S. Forest Service Geologist Mickley met with FHA and determined that conditions were unsafe and ordered FHA to cease work and to prepare a redesign for the site at MP 46.7.

20. FHA told WBC, ICW and the completion contract bidders that there would be no changes or redesigns to the contract and that work would be completed as per the Contract. In fact, FHA had already commenced work on redesigning MP 46.7 as well as several other sites.

21. WBC made repeated requests for FHA redesigns, but FHA claimed that there were none. WBC filed a Freedom of Information Act ("FOIA") action, the redesign for MP 46.7 was eventually provided and FHA paid WBC's legal costs. WBC discovered later in discovery that there were additional redesigns for several other sites that were not provided in the earlier FOIA request.

22. On or about December 19, 1998, FHA suspended work on the project for the winter to redesign portions of the project as requested by SNF.

23. On January 24, 1999, FHA began charging WBC interim liquidated damages of $400 per day and continued charging through October 3, 1999.

24. WBC was not paid for any work it performed on the project from September 1, 1998 until it was terminated for default on December 3, 1998.

25. On or about February 1999, ICW, under a reservation of rights, tendered Tidewater Contractors ("TWC") as the completion contractor for the project, and FHA accepted TWC.

26. On or about May 1999, ICW was paid approximately $102,000 for work performed by WBC. FHA retained $100,000 to cover liquidated damages for the period January 24, 1999 through September 30, 1999.

27. FHA issued modifications #1-3 to TWC on May 21, 1999, which added additional work and additional time to complete the project.

28. Under the Completion Contract, FHA relaxed specifications for TWC and sought and obtained relaxed environmental restrictions from other agencies. Under the Completion Contract, work previously performed by WBC that had been deemed unacceptable before termination was accepted by FHA without any additional work or modification by TWC. FHA also paid TWC for additional quantities of work at several sites that they did not perform.

29. FHA accepted the project as complete from TWC on or about October 29, 1999.

30. FHA opened FDR 33 to public travel on or about October 29, 1999, along with roads FDR 3347 and FDR 3347020.

31. Liquidated damages were assessed by FHA to WBC from January 24, 1999 until October 3, 1999 and were deducted from sums retained. In or about November 1999, FHA requested that ICW pay to FHA an additional $1,200 in liquidated damages.

32. WBC filed a complaint under the CDA in the U.S. Court of Federal Claims appealing the Termination for Default on or about November 30, 1999. The case is captioned *White Buffalo Construction, Inc. v. United States*, No. 99-961-C, and is assigned to Judge Loren A. Smith.

33. On December 21, 1999, WBC requested the Contracting Officer (the "CO") to issue a final decision on the liquidated damages claims and to further set forth the legitimate reasons that liquidated damages should not be withheld and should be released to WBC.

34. On or about January 6, 2000, WBC received from the FHA documents whose disclosure was compelled by a suit brought by WBC under the FOIA. The documents revealed that, contrary to repeated prior FHA representations, FHA had in fact redesigned the rock cut at MP 46.7.

35. On April 20, 2000, CO Parsons issued a final determination that the liquidated damages for the interim completion date are $101,200 based on 253 days at $400 per day.

36. On or about July 14, 2000, WBC filed a complaint under the CDA in the U.S. Court of Federal Claims. Captioned *White Buffalo Construction, Inc. v. United States*, No. 00-415-C, this action challenges the liquidated damages award. Cases Nos. 99-961C and 00-415-C were consolidated on or about July 18, 2000.

37. In or about January 2004, FHA announced that it had decided to convert the termination of WBC from a default to a termination for the convenience of the government. FHA consequently also withdrew its claim for liquidated damages. FHA also invited from WBC submission of convenience-termination settlement proposals.

38. On January 13, 2005, WBC timely filed with FHA its certified proposal, incorporated by reference herein, in the amount of $1,435,733.53. This included a claim for $925,834.91 in lost profits.

39. On October 16, 2006, WBC filed with FHA its revised proposal, incorporated by reference herein, in the amount of $1,251,404.81, which then was certified on November 10, 2006. The revised proposal reduced from $925,834.91 to $870,667 the lost-profits claim. The

reduction resulted from credits given to FHA of $28,183 for G&A and $26,985 for Equipment/Vehicle/Fuel, which were among unallocated costs sought elsewhere in the Revised Settlement Proposal. Of that $860,667 profit, $367,870.66 is for profit on work performed before termination. The $558,064.25 remainder is for profits lost on terminated future work and is the subject of a separate Court of Federal Claims action by WBC against the United States.

40. On or about April 19, 2007, WBC supplemented the Certifications for its January 13, 2005 Settlement Proposal and its October 16, 2006 Revised Settlement Proposal (the "Supplement"), incorporated by reference herein. The Supplement did not change the amounts sought in the October 16, 2006 Revised Settlement Proposal.

41. On June 26, 2007, WBC separately certified and submitted its Revised Settlement Proposal, incorporated by reference herein. As with the April 19, 2007 Supplement and October 16, 2006 Revised Settlement, the June 26, 2007 Supplement left unchanged WBC's request for $870,667 in profits.

42. On August 30, 2007, the CO made a decision on WBC's Revised Settlement Proposal, denying WBC's Proposal in part and allowing it in part. The CO denied WBC's lost-profits claim in its entirety.

43. WBC is a "party" within the meaning of 28 U.S.C. § 2412(2)(B) and entitled to its attorneys' fees herein pursuant to the Equal Access to Justice Act (the "EAJA").

**FIRST CLAIM FOR RELIEF**

**(Past Costs—Termination for Convenience)**

44. WBC incorporates paragraphs 38 through 41, above.

45. Under F.A.R. 49.201(a), WBC is entitled to be compensated fairly for the work done on the preparations made for the terminated portion of the Contract, including a reasonable allowance for profit.

46. As set forth in its certified claims, as revised through June 2007, fair compensation to WBC for the terminated portions of the Contract, including a reasonable allowance for profit on work actually performed, is shown below.

| No. | Item | Total Proposed |
|---|---|---|
| 1. | Job Costs | $128,598.08 |
| 2. | Direct Labor | $128,478.00 |
| 3. | Indirect Factory Expense | $0.00 |
| 4. | Special Tooling and Special Test Equipment | $0.00 |
| 5. | Other Costs Surety, Equipment | $395,721.00 |
| 6. | General and Administrative Expenses | $28,183.00 |
| 7. | TOTAL COST (items 1 thru 6) | $680,980.08 |
| 8. | Profit | $367,870.66 |
| 9. | TOTAL (items 7 and 8) | $1,048,850.74 |
| 10. | Deduct Finished Product Invoiced or to be Invoiced | $0.00 |
| 11. | TOTAL (item 9 less item 10) | $1,048,850.74 |
| 12. | Settlement Expenses | $163,070.28 |
| 13. | TOTAL (items 11 and 12) | $1,211,921.02 |
| 14. | Settlements with Subcontractors | $39,222.35 |
| 15. | Gross Proposed Settlement (items 13 thru 14) | $1,251,143.37 |
| 16. | Disposal and Other Credits | $0.00 |
| 17. | Net Proposed Settlement (item 15 less 16) | $1,251,143.37 |
| 18. | Advance, Progress & Partial Payments (from Schedule H) | $479,085.00 |
| 19. | Net Payment Requested (items 17 and 18) | $772,058.37 |

47. On October 30, 2007, the CO allowed and rejected WBC's Proposal as follows. The line items are not parallel, but in substance, the CO addressed the entirety of WBC's Proposal.

| | |
|---|---|
| Direct Labor: | $127,463.00 |
| Other Direct Job Costs: | $101,014.00 |
| Equipment, Vehicle and Fuel: | $26,985.00 |
| Other Equipment and Vehicle Costs: | $65,808.00 |
| Surety: | $261,646.00 |
| G&A Expenses: | $28,183.00 |
| Subcontractor Claim: | $29,528.00 |
| Profit: | $ 0.00 |
| Settlement Expenses: | $78,636.61 |
| Subtotal: | $719,263.61 |
| Payments Received: | ($479,085.00) |
| **Allowed Amount:** | **$240,178.61** |

48. The difference between WBC's Proposal and the amount allowed by the CO is $531,879.76. Based upon the decision of the CO, WBC has revised the amounts claimed for attorneys' fees by an estimated 20 percent, or $18,702.85, and payroll by an estimated 20 percent, or $8,664.38. WBC is entitled to the recovery of the amount of $503,512.53 plus pre- and post-judgment interest as provided by the CDA.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract—Lost Profits)**

49. WBC incorporates paragraphs 39 through 41, above.

50. FHA breached its implied obligations of good faith and fair dealing and duty to cooperate in facilitating WBC's performance of the contract, by:

a. Refusing to make for WBC the changes in plans and specifications subsequently made for TWC, as evidenced by the November 2002 Landmark Survey;

b. Refusing to acknowledge to WBC the differing site conditions recognized through accommodating TWC, as later evidenced by the November 2002 Landmark Survey;

c. Paying TWC and charging WBC for volumes never excavated, as later evidenced by the November 2002 Landmark Survey;

d. Terminating WBC for default where there were defective plans and specifications and differing site conditions, as later evidenced by the November 2002 Landmark Survey; and

e. Falsely stating to WBC that no design changes had been made and denying that there were no design-change documents, as later evidenced by the January 2000 FOIA disclosure and the November 2002 Landmark Survey

51. These breaches prevented WBC from completing the work it contracted to perform and denied to WBC the profits it would have earned upon full performance of the Contract.

52. A subsequent declaration by FHA converting a termination from a default to one of convenience termination does not impair a claim to profits lost on work arising from prior government breaches.

53. Had WBC been allowed to perform the Contract, it would have earned profits in the amount of $558,064.25. WBC is entitled to damages in that amount plus interest under the CDA and its attorneys' fees under the EAJA.

**THIRD CLAIM FOR RELIEF**

**(Abuse of Discretion—Bad Faith, Loss of Liability Limitation)**

54. WBC incorporates by reference paragraphs 38 through 41, above.

55. Under F.A.R. 49.202(a), lost future profits on termination work are not recoverable as part of a good-faith termination for convenience.

56. Where a convenience termination is the product of bad faith, there is no limit on recovery of lost future profits.

57. FHA's January 2004 conversion of the termination from default to convenience was the culmination of a pattern of bad-faith government conduct. Consequently, FHA is not entitled to escape liability for profits shown to have been lost on wrongly terminated future work.

58. Had WBC been allowed to perform, it would have earned profits in the amount of $558,064.25. WBC is entitled to damages in that amount plus interest under the CDA and its attorneys' fees pursuant to the EAJA.

**PRAYER**

WHEREFORE, WBC requests the following relief.

A. On its First Claim for Relief:

i. Damages in the amount of $504,512.53;

ii. Interest on that sum, or other amount awarded, dating from January 13, 2005;

iii. WBC's attorneys' fees under the EAJA and costs herein; and

iv. Such further relief as the Court deems appropriate.

B. On its Second Claim for Relief:

i. A finding that FHA has breached its implied contractual obligations of good faith and fair dealing;

ii. A declaration that FHA's conversion of a termination from default to convenience cannot and does not extinguish government liability for profits lost from breaches of contract occurring prior to the declaration of default;

iii. Recovery of $558,064.25 in profits lost on wrongfully terminated work;

iv. Interest on that amount, or other sum awarded, dating from January 13, 2005;

v. Its attorneys' fees under the EAJA and costs herein; and

vi. Such further relief as the Court deems appropriate.

C. On its Third Claim for Relief:

i. A finding that FHA has acted in bad faith;

ii. A declaration that FHA therefore cannot invoke the exclusion of lost future profits from amounts to be awarded under a convenience termination;

iii. Recovery of $558,064.25 in profits lost on wrongfully terminated work;

iv. Interest on that amount, or other sum awarded, dating from January 13, 2005;

v. Its attorneys' fees under the EAJA and costs herein; and

/////

/////

/////

/////

/////

/////

/////

vi. Such further relief as the Court finds appropriate.

DATED: October 17, 2007.

STOEL RIVES LLP

Richard E. Alexander, OSB No. 69002
Attorneys of Record for
White Buffalo Construction, Inc.

Richard E. Alexander, Attorney of Record
Charles F. Adams, Of Counsel
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
Telephone: (503) 224-3380
Facsimile: (503) 294-9167

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that I filed the original and seven (7) copies of COMPLAINT, the original and two (2) copies of the CIVIL COVER SHEET, the original and two (2) copies of the NOTICE OF DIRECTLY RELATED CASES, the original and two (2) copies of the DISCLOSURE STATEMENT and a check to cover the filing fee on October 17, 2007, by mailing via UPS, an overnight mail service, to:

David A. Lampen
Office of the Clerk
United States Court of Federal Claims
717 Madison Place, NW
Washington, D.C. 20005

Timothy P. McIlmail
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, D.C. 20530
Telephone (202) 616-0342
Facsimile (202) 514-7965

Richard E. Alexander, Attorney of Record
Charles F. Adams, Of Counsel
Of Attorneys for White Buffalo Construction, Inc.

Richard E. Alexander, Attorney of Record
Charles F. Adams, Of Counsel
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
Telephone: (503) 224-3380
Facsimile: (503) 294-9167